Final case this morning is Genband US v. Metaswitch Networks 2017-11-48. Good morning, Mr. Cabale. Cabale, your honor. Good morning. May it please the court, my name is Doug Cabale. I represent the patent holder Genband. Your honors, affirming the district court's denial of an injunction in this case, based on the record that we have in this case, would require a significant change in law. It's undisputed in this case that Genband and Metaswitch are direct competitors. In fact, since 2013, they've been fierce competitors for the sale of a platform of networking equipment that's been found to infringe seven different Genband patents. In the injunction hearing below, the district court heard evidence of the direct connection between Metaswitch's use of the patented technology and the customer demand for that technology. They heard from Metaswitch's CEO, who testified under cross-examination, that all of the features are actually things that customers are asking for. That's in the record at 2066. He testified that Metaswitch chose to invest in those features because customers wanted them. There's some ambiguity about what he meant by all those features, right? You're talking about the very patented technology that they appropriated, or it could be maybe that and a bunch of other features. Your honor, if your honor looks at the actual testimony in the record, I think the record is clear. He was asked the direct question, are the patented features important? He says, well, all those features are actually things customers are asking for. He's asked again, let me ask you again, are the patented features important or not? He says, we chose to invest in those features because customers wanted them. Now, my colleagues in their brief try to explain away that testimony by saying, well, he's only talking about the features that are actually advertised by Metaswitch. And these are among the main features that Metaswitch advertised. Even if you take all the features that are advertised as ones that customers are actually asking for and ones that customers want, the admission is that these are on that list. These are part of what customers are asking for, part of what customers want. And as their head of sales says at page 2076, the customers find these features to be important. Was the testimony you were just discussing part of what the district court referred to in conclusion of law number six on page? It's not, Your Honor. It's not? It's not. In conclusion of law number six, the court recites verbatim basically an argument that Metaswitch made in its post-trial brief, mischaracterizing the evidence that was provided to the district court. He does not have any discussion of the testimony from the CEO or the testimony from the head of sales or the testimony from Metaswitch's own damages expert saying that the 561 patent gave Metaswitch a competitive advantage in its sales or the testimony from, I should say, the internal documents from Metaswitch sales team saying that the 561 patent was a key selling point for them. That's at 816.36. He doesn't have any discussion. Yeah, and I get it that there are a number of items that you've identified in your briefing that are not called out in the judge's opinion or items that could barely fall into the three general categories he's identified. I guess what I'm wondering is for a discretionary ruling like granting or denying an injunction, what does our case law require in terms of to what degree does the district court decision have to go line by line, dime by dime through every single possible proposed argument and proposed fact finding? Sure. Your Honor, this court's precedent holds that at a minimum under Rule 52A, the district court was required to give an explanation of the reasons for denying the injunction. What we have here is a conclusion of Law No. 7 where the court simply found there was no finding, simply concluded that GenBan's presentation of evidence did not satisfy its burden of causal nexus. Conclusion of Law No. 6 before that is, again, a recitation from Metaswitch's post-trial brief that identifies three buckets of evidence that were presented under Metaswitch's view but ignores significant parts of the record. The way the record is, looking at the fullness of this record and the testimony that we have showing that there is direct evidence that customers were asking for these features, that they were giving a competitive advantage to Metaswitch, that customers were paying extra specifically for the patented features, customer survey evidence showing customers found this to be important, all of that evidence more than satisfies this court's standard in the Apple IV case, which is that GenBan's burden is to show that there is some connection between the infringement and the harm. What the district court did in this case, and it announced it in its conclusion of Law No. 4, was it was applying a standard saying that GenBan had to prove that the patented features drove demand for the products. In light of the evidence that we have that was presented, the only way that the court could get there was to say- That's a quote from our own case law. It is a quote, but that quote has been explained. In Apple IV, that quote was explained. In fact, the district court did the same thing in Apple IV that this district court did. In the district court in Apple- In fact, it was explained in Apple III. Some connection language comes from Apple III. The district court here did, while not referencing that portion of Apple III, did cite Apple III. It did cite Apple III. The portions that the district court used for the drives demand came from Apple I and Apple II. This court's decisions in Apple III and Apple IV go on to clarify that if the way you're applying the drive demand standard is to require that it's the sole or the primary basis for the demand, then that's an error of law. You have to show that there's some connection between the infringement and the- How do we know that the lower court judge here was necessarily thinking that you had to prove that these products were the sole- Sure. Judge Chen, we know that because when we look at conclusion of law number seven, the judge says that GenBan's presentation of evidence doesn't satisfy GenBan's burden of showing causal nexus. Right, but causal nexus is broad and vague and could mean he had the understanding of what we said in Apple III, Apple IV. The problem with that, Your Honor, is that when you look at the evidence that GenBan did present, which includes the testimony of their CEO and their head of sales saying that customers asked for these products and the litany of evidence that we've gone through in our brief, including our damages experts, our technical experts saying what the advantage of these products were, how they helped to drive sales. In light of all of that evidence, you simply can't get to a finding that there's no causal nexus if all you have to show is that there's some connection between the infringement and the demand. The only way you can get there is by requiring us to show that it was the sole or primary driver of the demand as the district court- But it's possible under that line of thinking that the lower court judge just concluded you didn't meet the sum connection. I mean, you obviously feel like you do, but he may have felt differently about that. Well, the judge has absolutely no findings with respect to the evidence that I've been reciting here today. There is a wealth of evidence, of direct evidence of consumer demand for this technology, and the district court made absolutely no factual findings with respect to any of that evidence. He simply concluded that our presentation didn't meet the burden, and this court should look at the whole record, including that evidence that the court did not even include within its categories in conclusion of law number six, and assess that. And when you do assess that, it would be unprecedented for direct competitors in a market like this, where infringement of seven patents has been found, and the other sides, CEO and head of sales, say these are things that customers are asking for. Their damages expert says they give a competitive advantage. The court also said you waited seven years, and you never asked for a preliminary injunction, and that is evidence of lack of irreparable harm. Judge Laurie, what the court specifically found with respect to the timing of the lawsuit is that, and this is in conclusion of law 31, that the timing of the lawsuit, bringing it in 2014, January of 2014, was not an unreasonable delay by GenBan, and it came to that conclusion after it actually- I'm sorry, that's in the Lachey's discussion. It was in the Lachey's discussion. Right, but he makes a separate point in, I don't know, conclusions of law eight through whatever, you know the page I mean, that relies on the, let's call it the amount of time it took you to bring suit, as the second reason for rejecting a finding of irreparable harm. The first being your evidence really doesn't amount to the required, in his view, causal nexus. But he does both of those, as I think he states, two reasons. He doesn't say independently sufficient reasons, but two reasons for not finding irreparable harm, right? Well, let me take that in two steps. First, all parties agree here that- Conclusion of law 12. Yes, Your Honor. All parties agree that a finding of delay cannot support a denial of injunction in this case. If you reversed on causal nexus, you have to- we would think that the record is strong enough that you ought to remand with an instruction to enter an injunction. But this case can't stand on delay alone. But with respect to your- I understand that would be your position. You said it's also- they admit that those factors are not dispositive. But with respect to the findings the court made, findings of fact 37 through 48 are specific detailed findings of fact that the court went through analyzing the timing of the lawsuit, and the court specifically found in finding of fact number 37 that Genban's delay in filing the lawsuit, that it was reasonable that Genban, in fact, did not know about the infringement after it acquired the CVAS assets. That was in 2010. It explained that it was reasonable during that time period because, number one, Metaswitch was not viewed as a major competitor, and number two, Metaswitch's infringement was minimal. It also specifically found in finding of fact number 38 that Metaswitch became a fierce competitor in 2013 or 2014, so less than a year before the lawsuit was filed. So in light of the court's specific findings that it was reasonable that we did not, in fact, know about the infringement and that it was not unreasonable delay to file this lawsuit in January 2014, that's wholly inconsistent with saying that any delay would be indicative of no irreparable harm. The other thing there is- Delay can be considered in two situations. Even reasonable delay could be considered in the balance of harms if there is an accompanying reliance on that delay, and if we look at conclusion of law 52, we know that the court has already found that there is no reliance on Metaswitch's part. The other place it can be considered is unreasonable delay can be considered in the irreparable harm side of things. But here we have a specific finding from the court that the timing of the filing of the lawsuit was not unreasonable delay. So since it's not unreasonable delay- So are you saying that as a matter of law, every time that the court finds no latches, therefore any form of delay, it can't be considered in the eBay factors? It can be considered in the balance of harms. But it can't be considered in irreparable harm? In irreparable harm, it should be considered the same way it's considered in the latches defense, and that is, is it reasonable or is it unreasonable? I'm sorry. Why wouldn't reasonable delay nevertheless have some evidentiary value on the question, did you guys think that you were being irreparably harmed? Well, the data points that we have from this court are the SCA case, the Federal Circuit's en banc decision in SCA, where the court specifically denoted that it was unreasonable delay that could be considered in connection with the irreparable harm. That's the data point that we have. You have almost exhausted your time. Do you want to- we'll hear from the other side and we'll give you back three minutes. Thank you, Your Honor. Mr. Verhoeven. Good morning, Your Honors. May it please the court. The district court should be affirmed in this case because the appellant hasn't come close to meeting its burden to show a causal nexus in this case. Do you think the lower court, maybe this is this court's fault, but do you think the lower court was a little confused over what is the right articulation of the causal nexus standard for irreparable harm? No, I don't, Your Honor. If you summarize it distinctly, it still doesn't drive demand. These other cases that follow on are explaining what that means. Right. I'm sorry. But one reading of A190 is that the judge wasn't embracing what we can all call further development of the understanding and meaning of the phrase driving consumer demand. He posits that GenBan or GenBan, whatever you call it, argues this, GenBan argues that, GenBan contends, and then GenBan argues. But the judge never takes the next step and says, yes, these are, in fact, the correct ways to understand the meaning of driving consumer demand. And I'm just wondering, what am I supposed to take away from this? I think there's a little bit of ambiguity, Your Honor, but the most reasonable interpretation of that is that he agrees. Just because he put GenBan before it, you'll notice he cites to the controlling authority. And he doesn't turn around and say, I disagree with what they said. Why should consumer demand have anything to do with whether there has been harm caused by the infringement? If someone is infringing a patent and there is a relationship, obviously, between what is being sold and what the patent covers, why does consumer demand come into it? Well, it doesn't, Your Honor. What we're talking about is the causal nexus between the demand. Well, let me take that back. The way it comes in is if you tie that demand to the specific... But I'm asking why consumer demand is relevant to harm. Oh, because... If there's infringement and you have a patent, you're harmed. Irreparable harm is another question, and that spills into the second factor. Your Honor, this is a case just like the Apple case where you have complex products that have thousands of different features. And in those kind of... It's not like a windshield wiper that's primarily got a specific feature. So in these very complex big product cases with thousands of features... But didn't they relate to lost profits and what the base was? No, it relates to... Rather than harm? It relates to... In these cases, just like the Apple case, you have to make some determination that there's a relationship between the feature that's accused of infringing among the thousands of features and an effect on consumer demand. And this court has come up with this causal nexus test in these kind of situations. Specifically, it's most important in these kind of... Is that a good test? Yes, it is. It's a good test. And it's important for... Today, we have increasingly complex objects. In the smartphone cases, we had computers that you can hold in your hand with thousands of features. But isn't that a question of harm, whether you've lost sales or profits because of the infringement? Because of the infringement. So you have to then ask the question, was the harm, was the loss of sales connected to the infringement? Another flipside way of saying that is, was the infringement... Is there a connection between the infringement and consumer demand? Which is the court's test. And here, the district court properly found that the appellant here has not met its burden of proof. One of the things I want to highlight is what's not... What we didn't see in the evidence in this case. They did not hire an expert to provide an opinion on causal nexus. The expert testimony you see cited in the record is not concerned causal nexus. They didn't even bother to hire an expert. There's no survey that they conducted in this case that tries to determine whether the accused features here had a causal effect on the demand by customers. Let me just say, the way that I guess I'm thinking about this is as follows. We have said in the series of Apple cases, under the heading of drives consumer demand, a number of different things. And there's a kind of a stricter version and a more flexible version. The more flexible version reflecting the fact that there is no unitary thing called consumer demand when you have a market consisting of lots and lots of demanders and lots and lots of features. So you have to take account of the mix of considerations that go into any substantial number, non-substantial number of choosers, of demanders. And Apple 3, in the part of it that the district court did not quote, kind of explains what I would call the more complicated, softer version. And then that is picked at the some connection paragraph of Apple 3. What the district court quotes from Apple 3 is from the previous paragraph and particular quotes a sentence that is referring to the harsher, more demanding standard and saying, but no, that really isn't quite right and that's why Apple 3 says the sole reason notion that I think in that case the district court had relied on was wrong. And Apple 3 says that. And then it's the next paragraph that really introduces the softer version and that's picked up in Apple 4. What I'm not really confident about from reading this brief discussion in the district court's opinion here is that the district court had that softer version in mind when saying the evidence was insufficient. And if that's right, I certainly don't feel like I've mastered all of the evidence back and forth to be able to make a determination that that difference between the softer and more rigid standards could not make any difference in the outcome here. So why don't we remand? Because the district court isn't required to lay out every piece of how consumer demand has been articulated. And secondly, the district court does expressly recognize the arguments that the appellant has made about some connection, cites to the Apple decisions and does not disagree with them. And as I stated before, I think the most clear interpretation of that is he does not disagree with them. And he's pointing out that the appellant has raised that those particulars about what it means to drive demand incited to the Apple cases. And so I understand, though, that it that maybe to a reader like me, the fact that the one positive thing that the judge adopted about our case law is the phrase driving consumer demand, which immediately puts him in a danger zone, because that's the exact same phrase that an Apple for this court deemed to be something that needed vacator on. In that particular case, because that phrase is so vulnerable to being used and understood in what Judge Toronto calls the harder, more rigid version. Yes, Your Honor. The way I look at it is the standard still is drives consumer demand. That's a standard. Now, interpretations of that have come afterwards. That does not mean one interpretation is that does not mean it's the sole or predominant driver of consumer demand. It has to have some connection. The other interpretation is it has to have some connection. Now, maybe the word some hasn't been defined by the Federal Circuit yet, but that those are both interpretations of the standard. And in this case, the judge stated the standard and then quoted Appellant's reference to the softer version, as you say, which is the current. I suppose this is stating the obvious, but the paragraph conclusion five, which, as you know, says GenBand argues, GenBand argues, GenBand contends, GenBand argues, is then followed not by saying, even under that view, I find. So I can't really tell whether what follows immediately after is a way of saying I'm applying those standards or GenBand has just argued this, but the standard isn't that low. Well, Your Honor, I think that it's very reasonable and probably I can't think of another reasonable interpretation of this. In addition to saying GenBand argues, the court cites to the Appell cases, the very Appell cases that we're talking about here, and the court does not say it disagrees with it. It brings it up. Their whole argument is just that he sticks the word GenBand argues in front of the propositions. The court itself is citing the Appell cases for those propositions, and the court itself is not disagreeing with them. The court does not disagree with that. It takes those as part of the statement of the law, and then it goes on, Your Honor. And there's no statement in here indicating the court is applying the predominant causal requirement or that it would be the exclusive driver of demand. There's no statement whatsoever here of that, Your Honor. I think that would be reaching out to interpret the court's statement of the law in a way that the court did not intend. And it would also be... But why should we be guessing about that? Why wouldn't it be more sensible, particularly when the next paragraph is really the only paragraph that discusses the evidence, and that is obviously, you know, it's four and a half lines long. And I don't think you would disagree that there was at least some amount of evidence on this question of how many sales may have been lost as a result of the patented features. That's not really referred to here. Your Honor, first of all, of course, as everyone knows, the judge is presumed to have considered all the evidence. But to answer your question, to do so would be essentially imposing a requirement on judges to talk all the way through every, you know, all the permutations of a standard. No, no, no, you know, I mean, it's a judgment call about how much discussion conveys that all the important matter has been discussed under the right legal standard. And sometimes what we're faced with is some uncertainty about that. And sometimes we don't have any uncertainty that makes us think the outcome is in any doubt. I'm not quite sure that we can reach that conclusion here. Well, again, there's no statement even addressing the primary, the prior incorrect interpretation of driving demand. And to the opposite, there's statements expressly talking about the some, what's the phrase? Some connection standard citing to Apple, the Apple cases. And the only basis for the vagueness is that the court phrased it as GenBan argues. The court never says it disagrees with that standard. And it's expressly invaded. So why do you think the judge used the phrase GenBan argues, GenBan argues, GenBan contends, and GenBan argues? To a certain extent, that's a way that the courts write opinions in the Eastern District. They often summarize things by arguments. But I can't explain why he put the words GenBan argues in front of it. But certainly the court was aware of the standard. The court cited the standard. And the court never said it disagreed with the standard. And so basically we're talking about what is the district court, how far is the district court required to go in reciting various cases and how are they interpreted? What we need to ask. Here's a hypothetical. This is going to a different issue. Let's say that GenBan had 26 pieces of evidence. Evidence A, B, C, all the way down to evidence Z. And then a district court decision said during the trial GenBan presented evidence A, evidence B, and evidence C. We don't find GenBan's evidence to be persuasive and to meet its burden. Under those circumstances, would you say a vacate and remand is required? No, Your Honor. This judge held an actual bench trial with live witnesses. He assessed credibility. He went to great effort to hear all the evidence. And we know, and I can cite you cases, that district court judges are presumed to have considered all the evidence. The fact that in this case we're talking about over 100 pieces of evidence, maybe 1,000. Where do you draw the line on how far a judge has to go in addressing each piece of evidence? Right, but I guess in the hypothetical, the judge isn't saying, I've considered all 1,000 pieces of evidence, and here's where I fall, and here's why I fall that way. It's more, I've considered evidence A, evidence B, and evidence C. Well, those are the main tranches in which the evidence was organized below. And the judge doesn't need to say, I've considered every piece of evidence, because the judge is presumed to have considered all the evidence. So there's plenty of instances when you have an opinion that doesn't say, I've considered all the evidence. Right, but now we're left in a position up here where all the briefing, there's 20 pages of briefing on each side about all these additional pieces of evidence that don't really fall in the three tranches. And now we're the ones now trying to figure out why the lower court judge could have been right in concluding that these pieces of evidence, likewise, don't help the patent owner. I think the evidence, if you look at it in the briefing, is indeed mostly in those three tranches, Your Honor. And the other evidence, I could go through and address, but it's not persuasive evidence. So, again, the court summarized as part of an 80-page opinion. There were a lot of issues before the district court. And the court went out of its way to hold a bench trial. It didn't just do it on the briefs, to assess the credibility of the parties. One of the things, this is why district courts are the primary people, or should be deferred to, and look for clear error. When you talk about all this evidence that you have to weed through, all you need to do is say, is there a piece of evidence that shows clear error? And there is none. You can go through each one of these pieces, which we don't have time to do, but none of those show clear error. And even together, they don't show clear error. There's no evidence. Thank you, counsel. Thank you, counsel. We have your argument. Thank you. Mr. Cubale has three minutes of rebuttal time. Thank you, Your Honor. Can I ask this? I assume you had some sort of counsel's argument before Judge Gilstrap about the injunction proceeding, not just witnesses. And was there discussion of the causation standard in that? There was, and there was specific recitation pointing to the cross-examination evidence we had elicited that customers were asking for these very features. That was specifically pointed out. Just on the question of what the right interpretation of the causation standard is, we've expressed a stricter view and a more flexible view. Were the parties debating that? Did everybody agree that, in particular the other side, agree that a sum connection standard is what the court should be applying? I'd have to check the briefing to be sure, but certainly they were focused on the drives customer demand as a lead argument of theirs. Whether or not they acknowledged the sum connection, I don't have an immediate recollection, Your Honor. The obvious problem is that the phrase drives customer demand by itself sounds harsh, but it has been interpreted to be not so harsh. And so if you emphasize that, you are suggesting this is a very, very high standard. You have to shed those words and replace them with other words, like the sum connection standard, to start getting the feel of how demanding the standard actually is. Right. And Your Honor pointed to Apple III and Apple IV, and there it was discussed three examples that would satisfy the sum connection. Not that those are the only ways, but one way was to show that it's one of several factors that customers consider in their buying choices. Another one was to show that there are benefits to the patent invention that make it more desirable, significantly more desirable for customers. Another one was to show that the absence of that invention would make it less desirable. And the evidence, and in particular the evidence that was not recited anywhere in the court's order on the injunction, shows that we satisfy counsel nexus under all of those examples, under all those standards. I take issue with my colleague's statement that pretty much all the evidence fell into those three categories. I don't think that's the case at all. The evidence of the CEO and the head of sales of their side, testimony about customers asking for this, that's not in that bucket. Evidence that their damages expert said that the 561 patent gives a competitive advantage to us, that's not in those buckets. Evidence from their documents saying that the 561 patent is a key selling point for them, not in those buckets. Evidence that we had a customer survey on the 279 and 589 patents where customers said this is important, not in those buckets. Evidence that customers were paying extra for these patented features, not in those buckets. We've got critical significant evidence here that, in our view, Your Honor, this is like the Bosch case, where we think if you were to remand this and anything came back other than an injunction should issue, what you'd be doing is basically giving them a stay of an injunction without a bond, which is inequitable. I think just like the Bosch case, in the Bosch case we had a fully developed record and it focused only on the injunction point. That's what we've got here. There they had 17 months between the jury finding of infringement and the oral argument. That's just what we have here. Thank you, counsel. Time is up. We will take the case on revising.